IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

Consumer Financial Protection Bureau,

*Plaintiff,*

*v.*

Federal Debt Assistance Association, LLC, et al.,

*Defendants.*

Case No. 1:17-cv-02997-GLR

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS FEDERAL DEBT ASSISTANCE ASSOCIATION, LLC, FINANCIAL DOCUMENT ASSISTANCE ADMINISTRATION, INC., CLEAR SOLUTIONS, INC., ROBERT PANTOULIS, <u>DAVID PICCIONE, AND VINCENT PICCIONE</u>**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

I.   Jurisdiction and Venue ................................................................................ 2

II.  The Defendants ............................................................................................ 2

III. Procedural History ...................................................................................... 3

IV.  Factual Background ..................................................................................... 3

    A.  FDAA advertised that it would eliminate consumers' debt and
        improve their credit scores. ............................................................... 4

    B.  FDAA posed as a government-affiliated entity ......................................... 6

    C.  FDAA took upfront fees from consumers ................................................. 8

    D.  Federal Debt, Financial Document, and Clear Solutions acted in
        concert and were owned and operated by Robert Pantoulis,
        Vincent Piccione, and David Piccione. .......................................... 9

    E.  FDAA received millions of dollars from consumers ................................. 10

V.   Argument ................................................................................................... 10

    A.  Default judgment is warranted ................................................................. 10

    B.  Plaintiff's substantive claims are well-pleaded and meritorious .............. 11

        1. Defendants collected advance fees for debt-relief and
           Credit-repair services in violation of the TSR
           (Counts 1 and II) ............................................................................... 11

        2. Defendants' deceptive advertising violated the TSR
           and the CFPB (Counts III, IV, and VII) ............................................ 13
           Defendants did not make required TSR disclosures
           (Count V) .......................................................................................... 15

        3. By posing as a government entity, Defendants violated
           the TSR and CFPA (Counts VI and VIII). ........................................ 16

        4. The corporate entities acted as a common enterprise ................... 18

        5. The Principals are individually liable because they
           are covered persons who engaged in deceptive acts
           and also because they provided substantial assistance
           to FDAA's violations ......................................................................... 18

    C.  Plaintiff's Complaint supports the relief it requests .................................. 21

        1. Injunctive relief is required to prevent future violations ................ 21

        2. Monetary relive is required to compensate consumers ................... 23

        3. Civil money penalties ....................................................................... 23

Conclusion .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*CFPB v. D & D Mktg.,*
  2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ................................................................20

*CFPB v. Frederick J. Hanna & Associates*, P.C.,
  114 F. Supp. 3d 1342 (N.D. Ga. 2015) ..................................................................... 14

*CFPB v. Gordon,*
  819 F.3d 1179 (9th Cir. 2016) ................................................................................. 14

*CFPB v. NDG Fin. Corp.*, 15-cv-5211 (CM),
  2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ....................................................14, 18

*Delaware Watch Co. v. FTC,*
  332 F.2d 745 (2d Cir. 1964) ..................................................................................... 18

*Entrepreneur Media, Inc. v. JMD Entertainment Group, LLC,*
  958 F. Supp. 2d 588 (D. Md. 2013) .................................................................... 4, 10

*FTC v. Affiliate Strategies, Inc.,*
  849 F. Supp. 2d 1085 (D. Kan. 2011) ................................................................... 14

*FTC v. Affiliate Strategies, Inc.,*
  2011 WL 4352411 (D. Kan. Sept. 16, 2011) ....................................................14, 21

*FTC v. E.M.A. Nationwide, Inc.,*
  2013 WL 4545143 (N.D. Ohio Aug. 27, 2013) ..................................................... 14

*FTC v. Febre,*
  128 F.3d 530 (7th Cir. 1997) ................................................................................... 23

*FTC v. Good Ebusiness, LLC,*
  2016 WL 3704489 (C.D. Cal. July 12, 2016) ....................................................... 15

*FTC v. Loma Int'l Bus. Grp., Inc.,*
  2013 WL 2455986 (D. Md. June 5, 2013) ............................................................. 17

*FTC v. Ross,*
  897 F. Supp. 2d 369 (D. Md. 2012) ...................................................................... 23

*FTC v. Stefanchik,*
  559 F.3d 924 (9th Cir. 2009) ................................................................................. 23

*FTC v. Tax Club, Inc.,*
  994 F. Supp. 2d 461 (S.D.N.Y. 2014) ............................................................. 18

*FTC v. Think Achievement Corp.,*
  144 F. Supp. 2d 993 (N.D. Ind. 2000) ............................................................ 16

*Pennsylvania v. Think Fin., Inc.,*
  2016 WL 183289 (E.D. Pa. Jan. 14, 2016) ...................................................... 18

*Pope v. United States,*
  323 U.S. 1 (1944) ...................................................................................... 21, 22

*SEC v. Apuzzo,*
  689 F.3d 204 (2d Cir. 2012) ............................................................................ 20

*SEC v. Lawbaugh,*
  359 F. Supp. 2d 418 (D. Md. 2005) ................................................................. 10

*SEC v. Lorin,*
  76 F.3d 458 (2d Cir. 1996) .............................................................................. 21

*SEC v. Zale Corp.,*
  650 F.2d 718 (5th Cir. 1981) ........................................................................... 21

*Teamsters Local 639 Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, No.,
  2016 WL 7391516 (D. Md. Dec. 19, 2016) ..................................................... 21

*United States v. Carson,*
  52 F.3d 1173 (2d Cir. 1995) ............................................................................ 21

*United States v. USA Home Loans, Inc.,*
  No. JFM 06 CV 2850 (D. Md. Oct. 31, 1006) ................................................. 22

**Statutes**

12 U.S.C. § 5301 ............................................................................................... 1
12 U.S.C. § 5481(25)(C)(i) ............................................................................. 19
12 U.S.C. § 5536(a)(3) ............................................................................... 19, 20
12 U.S.C. § 5564(f) ........................................................................................... 2
12 U.S.C. § 5565 .............................................................................................. 21
12 U.S.C. § 5565(a)(1) ...................................................................................... 2
12 U.S.C. § 5565(a)(2)(C) ............................................................................... 23
12 U.S.C. § 5565(c)(1) ..................................................................................... 23
12 U.S.C. § 5565(c)(2) ..................................................................................... 24
12 U.S.C. § 5565(c)(3) ..................................................................................... 24
12 U.S.C. §§ 5481(5), (6), (15)(A)(viii)(II) .................................................. 14
12 U.S.C. §§ 5481(14), 5491(a), 5511, 5531(a) ............................................. 2

12 U.S.C. §§ 5531, 5536(a)(1)(B) ...................................................................... 14
12 U.S.C. §§ 5536(a)(1)(A), (B)................................................................... 16, 19
15 U.S.C. § 1681 .................................................................................................. 4
15 U.S.C. § 1692 .................................................................................................. 3
15 U.S.C. § 6105(d) ......................................................................................... 1, 2
28 U.S.C. § 1331 .................................................................................................. 2
28 U.S.C. § 1345.................................................................................................. 2

**Rules**

Federal Rule of Civil Procedure 55(b)(2)....................................................... 1, 10
Rule 55 of the Federal Rules of Civil Procedure ............................................. 10

**Regulations**

12 C.F.R. § 1083.1 ............................................................................................. 24
16 C.F.R. Part 310.............................................................................................. 1
16 C.F.R. § 310.2(dd), (ff)................................................................................11
16 C.F.R. § 310.2(gg) .......................................................................................11
16 C.F.R. § 310.2(o) ......................................................................................... 12
16 C.F.R. § 310.3(a)(1)(viii)(C) ...................................................................... 15
16 C.F.R. § 310.3(a)(2)(iii), (x) ....................................................................... 13
16 C.F.R. § 310.3(a)(2)(vii).............................................................................. 16
16 C.F.R. § 310.3(a)(2)(x) ................................................................................ 13
16 C.F.R. § 310.3(b) ......................................................................................... 21
16 C.F.R. § 310.4(a)(2) ............................................................................... 11, 12
16 C.F.R. § 310.4(a)(5)(i)............................................................................ 11, 12
60 Fed. Reg. 43,842 (Aug. 23, 1995)............................................................... 21
75 Fed. Reg. 48,458....................................................................................13, 14

Plaintiff (Bureau) filed this action to bring an end to the "debt validation" system that Defendants, falsely claiming to be a government-affiliated entity, used to deceive consumers out of nearly $5 million. Targeting financially vulnerable consumers, Defendants' telemarketers promised to eliminate consumers' unsecured debts and improve their credit scores in exchange for $12,000–$19,000 in advanced fees. Consumers who used Defendants' program, however, were often left in worse financial condition, with increased debt loads, unimproved credit scores, and, in some instances, having been sued by their creditors. The Bureau filed suit on October 12, 2017, alleging that Defendants' conduct violated the Telemarketing Sales Rule (TSR) and the Consumer Financial Protection Act (CFPA).[1]

Each of the six Defendants in this lawsuit—Federal Debt Assistance Association, LLC, Financial Document Assistance Administration, Inc., Clear Solutions, Inc., Vincent Piccione, David Piccione, and Robert Pantoulis (collectively, Defendants)—was properly served with a summons and a copy of the Complaint.  None has answered or otherwise responded to this action. The time for doing so has expired, and the Clerk of the Court has entered a default against each Defendant.[2] The Bureau respectfully requests that the Court enter the attached proposed Default Judgment and Order for Permanent Injunction and Monetary Relief (Default Judgment) under Federal Rule of Civil Procedure 55(b)(2).

---

[1] 16 C.F.R. Part 310; 15 U.S.C. § 6105(d); 12 U.S.C. § 5301 et seq.
[2] ECF Nos. 14, 17.

## I.     Jurisdiction and Venue

This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law,"[3] presents a federal question,[4] and is brought by an agency of the United States charged with regulating the offering and provision of consumer-financial products and services, including under the CFPA and TSR.[5] Venue is proper in this district because Defendants are located, reside, and do business in this district.[6]

## II.     The Defendants

Federal Debt Assistance Association, LLC (Federal Debt) was created by Defendants Vincent Piccione, David Piccione, and Robert Pantoulis (collectively, the Principals) and began operating on January 14, 2016, using telemarketing to offer consumers debt-relief and credit-repair services.[7] On February 23, 2017, the Principals ceased operating under the name Federal Debt, formed a new entity, and began operating as Financial Document Assistance Administration, Inc. (Financial Document).[8] Federal Debt and Financial Document (collectively FDAA) differed only in name.[9] The Principals also created and operated Clear Solutions, Inc. (Clear Solutions), to process FDAA's credit card payments and maintain FDAA's bank accounts.[10]

---

[3] 12 U.S.C. § 5565(a)(1).
[4] 28 U.S.C. § 1331.
[5] 28 U.S.C. § 1345; 12 U.S.C. §§ 5481(14), 5491(a), 5511, 5531(a); 15 U.S.C. § 6105(d).
[6] 12 U.S.C. § 5564(f).
[7] Compl. ¶¶ 5, 9-11.
[8] Compl. ¶¶ 6, 7.
[9] Compl. ¶ 7.
[10] Compl. ¶ 8.

### III.    Procedural History

Defendants are well aware of the Bureau's investigation and this suit against them. In the six months leading up to this action, the Bureau was actively investigating FDAA, which was then represented by counsel, including by issuing civil investigative demands to FDAA, receiving responses to document requests and interrogatories, and taking sworn testimony of FDAA through its corporate representative, Vincent Piccione.[11] On October 12, 2017, Bureau counsel sent a courtesy copy of the Complaint to counsel representing FDAA in the Bureau's investigation.[12]

When the Bureau's requests for waivers of service went unanswered by the Defendants, the Bureau effectuated personal service on Federal Debt, Financial Document, Clear Solutions, Robert Pantoulis, and David Piccione with a summons and copy of the Complaint.[13] Unable to serve Vincent Piccione, the Bureau sought and received permission from this Court to serve him via alternative methods, which it accomplished on January 17, 2018.[14] None of the Defendants responded to this lawsuit. The Clerk of the Court entered a default against five of the six Defendants on January 26, 2018, and against Vincent Piccione on March 15, 2018.[15] Defendants' failure to respond to the Complaint cannot be explained by any deficiency in notice.

### IV.    Factual Background

FDAA, under the guise of being an affiliate of the Federal government, offered a self-styled "debt validation" program through which it purported to reduce or eliminate

---

[11] Ex. A, Decl. of Carmen Christopher.
[12] Ex. A, Decl. of Carmen Christopher.
[13] ECF No. 9.
[14] ECF Nos. 10-11, 15.
[15] ECF Nos. 14, 17.

consumers' debt balances by relying on the debt-verification process set forth in the Fair Debt Collection Practices Act (FDCPA)[16] and the dispute process under the Fair Credit Reporting Act (FCRA).[17] FDAA collected nearly $5 million in illegal up-front fees from about 575 consumers who were misled about the results it could achieve.[18]

### A.   FDAA advertised that it would eliminate consumers' debt and improve their credit scores.

As alleged in the Complaint,[19] on January 14, 2016, the Principals formed and began operating FDAA, a debt-management company offering debt-relief and credit-repair services.[20] To solicit consumers, FDAA used direct mailers, voicemail drops, and avatar calls.[21] When consumers called in response to a solicitation, FDAA's employees strictly followed telemarketing scripts to promote the company's services, answer questions, and enroll consumers in FDAA's program.[22] The telemarketing scripts directed FDAA employees to describe the mechanics of the company's debt-management program.[23] First, consumers were told to stop making payments on their debts so that the creditors would sell the debt to a third-party collector or service provider for collection.[24] FDAA explained that only after a "debt [was] sold off to a debt collector or another 3rd party servicer" could it then perform the next step in the process—responding to the collector's demand on the consumer's behalf with a Notice

---

[16] 15 U.S.C. § 1692 et seq.

[17] 15 U.S.C. § 1681 et seq.

[18] Exhibit A ¶¶ 12, 16.

[19] For purposes of this motion, the court accepts as true the well-pleaded factual allegations in the complaint.  *Entrepreneur Media, Inc. v. JMD Entertainment Group, LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013).

[20] Compl. ¶¶ 5-7, 9-11.

[21] Compl. ¶¶ 19-30.

[22] Compl. ¶¶ 32, 33.

[23] Compl. ¶¶ 35, 42.

[24] Compl. ¶¶ 42-44.

and Demand for Verification of Debt (NDVD).[25] The NDVD was a boilerplate demand for information and documents from the collector that was in no way tailored to a particular customer's situation.[26]

FDAA, through its telemarketing employees, also told potential customers that a debt collector that failed to provide every answer or document requested in the NDVD would be violating the law.[27] FDAA additionally told consumers that such a failure would render the debt "invalid, uncollectable, and in conclusion the debt must be expunged from your credit report."[28] FDAA further explained that if it was not satisfied with a debt collector's response to its NDVD, it would send a notice of insufficient response (NOI) stating that the collector was out of compliance with the NDVD.[29] And, if the collector did not provide FDAA with a satisfactory response to its NOI within fifteen days, FDAA—purporting to apply certain provisions of the FDCPA—deemed the debt invalid.[30] FDAA then generated what it referred to as a "commercial record" stating that the balances of the debts had been reduced to zero.[31] FDAA claimed that after it deemed a debt invalid, the debt would be removed from the consumer's credit report and that the consumer could not be sued over the debt.[32]

During these calls, FDAA told consumers that its program was "more beneficial than the other relief programs that exist" because it would reduce consumers' principal-debt balances "by at least 60%" and improve consumers' credit scores within the first

---

[25] Compl. ¶¶ 17.b, 44.
[26] Compl. ¶ 17.c.
[27] Compl. ¶¶ 44-46.
[28] Compl. ¶ 46.
[29] Compl. ¶ 17.d.
[30] Compl. ¶¶ 17.e, 46.
[31] Compl. ¶ 17.e.
[32] Compl. ¶¶ 47, 49.

year.[33] FDAA also claimed that (1) its debt-management program would take only one to two years and would leave the consumer with an improved credit score "potentially allowing you to receive the best rates on the market," and (2) its credit-restoration program would increase a consumer's credit score to "well beyond where it was when you started this program."[34]

Despite representing to consumers that FDAA's program eliminated 60% of a consumer's debt, FDAA never tracked the amount of debt it supposedly eliminated for its customers.[35] FDAA did not tell its customers that, even if a third-party collector or servicer failed to respond to FDAA's demand for debt validation, the original creditor retained a right to sue on the unpaid debt.[36] FDAA also failed to warn consumers that discontinuing debt payments could (1) cause them to incur additional fees and interest or (2) result in them being sued by their creditors or debt collectors.[37]

## B.    FDAA posed as a government-affiliated entity.

FDAA, a privately-owned company with no government affiliation, endorsement, or sponsorship, designed its solicitations to look like those of a government-affiliated entity.[38] It sent direct mailers to consumers in an envelope that bore a seal modeled after the Great Seal of the United States, listed a Washington, D.C., return address (even though FDAA operated out of Maryland), and included an official-looking "WARNING" threatening a fine or imprisonment for tampering with the letter, complete with a

---

[33] Compl. ¶¶ 16, 17, 37.
[34] Compl. ¶¶ 38, 48.
[35] Compl. ¶ 77.
[36] Compl. ¶¶ 49-52.
[37] Compl. ¶¶ 49-50.
[38] Compl. ¶¶ 23-30.

citation to the United States Code.[39] The solicitation letter in the mailer identified itself as a "regulatory notification," listed a specific "entitlement amount," assigned the consumer an "FDAP case number," and bore the same seal as the envelope.[40] The letter also contained a string of misleading statements, including:

- "[s]ince the CFPB['s] creation, [several major credit card companies] and other  financial institutions have been charged fine[s] and restitution to consumers of over $200 billion dollars for financial malfeasance and credit card misconduct";

- "[b]ased on these relevant findings within the regulatory provisions the FDAA has established [its program] herein with referred to as FDAP"; and

- FDAA "has reviewed your credit card records and determined that you may be entitled to reduce your credit card debt."[41]

At the beginning of calls with consumers, FDAA personnel told consumers that FDAA's program ensured that consumers received a portion of the Bureau's ordered fines and restitution in the form of credit-card reductions.[42] During calls with consumers, FDAA, through employees referring to themselves as "federal debt specialists" or "debt specialists," claimed that its debt-validation program was an "FTC approved process" and that its "agents" were "authorized to review, consult, and prepare consumer protection documents on your behalf."[43] If asked whether FDAA was a government program, FDAA employees stated that "[r]egulations outlined in the 2009

---

[39] Compl. ¶¶ 29-30.
[40] Compl. ¶¶ 24, 28.
[41] Compl. ¶¶ 26-27.
[42] Compl. ¶ 35.
[43] Compl. ¶¶ 15, 31.

Credit Card Act and 2010 Dodd Frank Consumer Protection Act allowed for the creation of the Federal Debt Assistance Association."[44]

## C.       FDAA took upfront fees from consumers.

FDAA required each customer to pay an upfront fee of $12,000 to enroll in its program.[45] If a customer was unable to pay the entire $12,000 fee upfront, FDAA required the customer to pay a smaller upfront fee and sign a contract for subsequent monthly payments until the entire cost of the program—which could be up to $19,000—had been paid.[46] FDAA encouraged its customers to make the largest down payment possible, and it recommended that customers max out their credit cards to make the down payment, claiming that this debt would eventually be eliminated under FDAA's program.[47] Between FDAA's inception and the time this lawsuit was filed in October 2017, FDAA collected millions of dollars from hundreds of consumers.[48] All of the down payments were collected before FDAA sent any letters to creditors or provided any services to consumers.[49] FDAA also collected monthly installment payments without ever providing its purported credit-restoration program to consumers.[50]

---

[44] Compl. ¶ 36.
[45] Compl. ¶¶ 54, 59.
[46] Compl. ¶ 55.
[47] Compl. ¶¶ 56-57.
[48] Compl. ¶ 60.
[49] Compl. ¶ 59.
[50] Compl. ¶ 53.

**D.**     **Federal Debt, Financial Document, and Clear Solutions acted in concert and were owned and operated by Robert Pantoulis, Vincent Piccione, and David Piccione.**

At all material times, Robert Pantoulis, Vincent Piccione, and David Piccione co-owned FDAA,[51] and each owner was instrumental in FDAA's daily operations. Vincent Piccione was FDAA's president, had final decision-making authority for FDAA, and he developed the company's marketing materials, oversaw the marketing activities, and identified consumers to solicit.[52] David Piccione participated in designing and developing the company's marketing materials and served as the telemarking-sales floor manager, overseeing the sales representatives who enrolled customers and ensuring that they followed FDAA's telemarketing sales scripts.[53] Robert Pantoulis was the director of client services and managed the debt-management program.[54]

Robert Pantoulis, Vincent Piccione, and David Piccione also collectively owned Clear Solutions, which was advertised as FDAA's parent company, processed FDAA's credit-card payments, maintained FDAA's bank accounts, and shared the same physical address with FDAA.[55] Clear Solutions conducted business only with FDAA.[56]

**E.**     **FDAA received millions of dollars from consumers.**

Between January 2016, when it began operating, and the end of the first quarter of 2017, FDAA stated that it generated $4,728,078.77 in revenue from consumers.[57] FDAA continued to take money from consumers after the first quarter of 2017. Bank

---

[51] Compl. ¶¶ 9-11. David Piccione transferred his share in June 2017, leaving only Robert Pantoulis and Vincent Piccione as the owners. Compl. ¶ 10.
[52] Compl. ¶ 9.
[53] Compl. ¶ 10.
[54] Compl. ¶ 11.
[55] Compl. ¶¶ 8, 12.
[56] Compl. ¶ 12.
[57] *See* Exhibit A ¶¶ 13,16.

records show that it received an additional $244,310.54 from consumers between April 2017 and June 2017.[58] Based on FDAA's own statements and bank records reviewed by the Bureau, FDAA took at least $4,972,389.31 from consumers.[59]

## V.    Argument

### A.    Default judgment is warranted.

Entries of default and default judgment are governed by Rule 55 of the Federal Rules of Civil Procedure. Once a defendant has defaulted, the plaintiff may move for default judgment.[60] A default judgment is appropriate when the "adversary process has been halted because of an essentially unresponsive party."[61] When, as here, the plaintiff's complaint does not specify a "sum certain" amount of damages, the court may enter a default judgment against the defendant under Rule 55(b)(2). In considering liability in a motion for default judgment, the court accepts as true the well-pleaded factual allegations in the complaint.[62] The Court analyzes those facts to determine whether they support a finding of liability.  Upon finding that liability is established, the court must then make an independent determination regarding damages.[63]

A default judgement for injunctive and monetary relief is appropriate in this case. Defendants failed to answer or otherwise respond to the Bureau's Complaint, and default has been entered against all six Defendants. The Bureau's Complaint states a

---

[58] *See* Exhibit A ¶¶ 15-16.
[59] *See* Exhibit A ¶ 16.
[60] *See SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).
[61] *Lawbaugh*, 359 F. Supp. 2d at 421.
[62] *Entrepreneur Media, Inc. v. JMD Entertainment Group, LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013).
[63] *See Lawbaugh*, 359 F. Supp. 2d at 422; *Entrepreneur Media*, *958* F. Supp. 2d at 593 (noting that the court need not conduct an evidentiary hearing to determine damages but may rely instead on affidavits or documentary evidence in the record to determine the appropriate sum).

claim sufficient to support the Court's finding of liability on all counts. And the evidence presented by the Bureau supports the monetary relief sought.

**B.      Plaintiff's substantive claims are well-pleaded and meritorious.**

Each of the Bureau's claims is well-pleaded and supports the relief sought, and the Court should hold Defendants liable on all counts.

### 1.      Defendants collected advance fees for debt-relief and credit-repair services in violation of the TSR (Counts I and II).

The TSR applies to "telemarketing," defined to mean "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."[64] FDAA is subject to the TSR as (1) a "telemarketer" because, in connection with telemarketing, it initiated and received telephone calls from customers and (2) a "seller" because, in connection with a telemarketing transaction, it provided or offered to provide services to its customers in exchange for consideration.[65] The TSR prohibits telemarketers from requesting or receiving advance fees for both debt-relief and credit-repair services.[66]

FDAA illegally collected advance fees for its debt-relief and credit-repair services. FDAA provided a "debt relief service" as defined by the TSR because it offered to renegotiate, settle, or alter the terms of payment or other terms of debt between consumers and their unsecured creditors or debt collectors, by offering to eliminate

---

[64] 16 C.F.R. § 310.2(gg).

[65] 16 C.F.R. § 310.2(dd), (ff); Compl. ¶¶ 5-6, 19-22.

[66] 16 C.F.R. § 310.4(a)(5)(i) (prohibiting advance fees for debt-relief services); 16 C.F.R. § 310.4(a)(2) (prohibiting advance fees for credit-repair services).

consumers' debts.[67] Under the TSR, a debt-relief-service provider cannot request or receive payment of its fees unless (1) it has renegotiated, settled, reduced, or altered the terms of at least one debt under a bona fide agreement or plan with the creditor or debt collector, (2) the customer has made at least one payment under that agreement or plan, and (3) the fee is proportional to or a percentage of the amount saved.[68]

FDAA also promised to repair consumers' creditworthiness. With respect to credit-repair services, a telemarketer cannot request or receive payment of its fees for services purporting to remove derogatory information from or improve a person's credit history, credit record, or credit rating until (1) the promised timeframe for providing the services has expired and (2) the seller has provided a consumer credit report demonstrating that the promised results have been achieved, and the report is issued more than six months after the results were achieved.[69]

FDAA collected fees in advance of achieving the prerequisite results required by the TSR. As alleged in the Complaint, FDAA collected upfront fees of about $12,000 to $19,000 from its customers before doing any of the debt-relief or credit-repair work it promised.[70] For its debt-relief services, FDAA continued to collect monthly installment payments (1) regardless of whether any results were achieved and (2) in amounts that were standard rather than proportional to the debt eliminated.[71] For its credit-repair

---

[67] 16 C.F.R. § 310.2(o).
[68] 16 C.F.R. § 310.4(a)(5)(i).
[69] 16 C.F.R. § 310.4(a)(2).
[70] Compl. ¶¶ 17, 54.
[71] Compl. ¶¶ 17, 55, 63.

services, FDAA never performed any such services for consumers.[72] FDAA, therefore, violated the TSR each time it collected a fee.

### 2. Defendants' deceptive advertising violated the TSR and the CFPA (Counts III, IV, and VII).

FDAA violated both the TSR and the CFPA when it mispresented that its program (a) reduced consumers' principal-debt balances "by at least 60%," (b) left creditors with no legal recourse for collecting the debt, and (c) would improve consumers' credit scores to higher than when they enrolled.[73]

The TSR prohibits a seller or telemarketer from misrepresenting "any material aspect of the performance, efficacy, nature, or central characteristic of goods or services that are the subject of a sales offer," and "any material aspect of any debt relief service."[74] Misrepresentations about material aspects of debt-relief services include: (1) "the percentage of the debt amount that a customer may save by using such service"; (2) "the effect of the service on collection efforts of the customer's creditors or debt collectors"; and (3) "the effect of the service on a customer's creditworthiness."[75] When making representations about a material aspect of its service, a seller or telemarketer must have a reasonable basis to substantiate its claims.[76] Because FDAA neither tracked the effect of its services on its consumers' debt balances nor actually provided credit-repair services, FDAA had no reasonable basis to substantiate its claims that it could

---

[72] Compl. ¶ 53.
[73] Compl. ¶¶ 16, 37, 38, 48-50.
[74] 16 C.F.R. § 310.3(a)(2)(iii), (x).
[75] 16 C.F.R. § 310.3(a)(2)(x).
[76] 75 Fed. Reg. 48,458, 48,500-501 (Aug. 10, 2010) ("The reasonable basis test is an objective standard; an advertiser's good faith belief that its claim is substantiated is insufficient.")

reduce a consumer's debt by 60%, leave consumers' creditors without recourse on the debts, or to know whether or by how much it could increase a consumer's credit score.[77]

The CFPA prohibits "any covered person" from engaging in any deceptive act or practice.[78] FDAA is a "covered person" because it engaged in offering or providing consumer-financial products or services, which includes "financial advisory services" that assist consumers with "debt management."[79] Under the CFPA, an act or practice is deceptive if there is a material representation that is likely to mislead consumers acting reasonably under the circumstances.[80] A misrepresentation is considered "likely to mislead consumers" if it is either (a) false or (b) there is no reasonable basis to support it.[81] Representations about the savings customers will experience from a debt-relief service are "highly material claims," as are claims about the impact on creditworthiness and on creditors' abilities to collect debts.[82]

---

[77] *See FTC v. E.M.A. Nationwide, Inc.*, No. 1:12-CV-2394, 2013 WL 4545143, at *4 (N.D. Ohio Aug. 27, 2013), aff'd, 767 F.3d 611 (6th Cir. 2014) (defendant violated § 310.3(a)(2)(x) where scripts instructed employees to tell consumers that its program would cut their "debt by 50% OR MORE" and where it told one consumer that it would relieve sixty to sixty-five percent of her debt, took an upfront fee, and provided no assistance); *FTC v. Affiliate Strategies, Inc.*, No. 09-4104-JAR, 2011 WL 4352411, at *6, 9 (D. Kan. Sept. 16, 2011) (no basis to substantiate the claims that consumers were "guaranteed" or likely to receive grant money based on company's "high success rates" when defendants did not track their success rate).

[78] 12 U.S.C. §§ 5531, 5536(a)(1)(B).

[79] *See* 12 U.S.C. §§ 5481(5), (6), (15)(A)(viii)(II).

[80] *See CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016); *CFPB v. NDG Fin. Corp.*, 15-cv-5211 (CM), 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016); *CFPB v. Frederick J. Hanna & Associates*, P.C., 114 F. Supp. 3d 1342, 1370 (N.D. Ga. 2015) ("deceptive practice" has the same meaning under the CFPA that it has under the FTC Act).

[81] *See FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1106 (D. Kan. 2011) (claims about success rate were misleading because defendants did not track success).

[82] 75 Fed. Reg. 48,499 (because they are "highly material," the TSR prohibits misrepresentations about the amount of debt a consumer might save or the effect of a service on a consumer's creditworthiness or on a collector's efforts).

FDAA's representations were likely to mislead reasonable consumers and were deceptive under the CFPA. Because it did not track the results of its program, FDAA lacked a reasonable basis to make its representations about debt elimination, foreclosing legal rights of originating creditors, or credit repair. These misrepresentations go to the heart of FDAA's program and were therefore material. Moreover, it was reasonable for consumers to rely on the statements that FDAA made about its own program.

### 3.  Defendants did not make required TSR disclosures (Count V).

Under the TSR, a seller or telemarketer of a debt-relief service that relies on a customer failing to make timely debt payments must clearly and conspicuously disclose—before the consumer consents to pay for the services—that failing to make timely payments may result in the consumer being sued or an increase in the amount owed.[83] FDAA instructed consumers to stop making payments on the debts enrolled in its program, but it never disclosed that doing so may lead to the potential consequences set forth in the TSR.[84] FDAA violated the TSR when it did not make the required disclosures.[85]

### 4.  By posing as a government entity, Defendants violated the TSR and CFPA (Counts VI and VIII).

FDAA's misrepresentations about its affiliation with, endorsement by, or sponsorship by the Federal government, specifically the Bureau and the Federal Trade Commission (FTC), violate both the TSR and the CFPA. Defendants designed FDAA's

---

[83] 16 C.F.R. § 310.3(a)(1)(viii)(C).

[84] Compl. ¶¶ 42-43.

[85] *FTC v. Good Ebusiness, LLC*, No. 2:16-cv-01048-ODW-JPR, 2016 WL 3704489, at *5 (C.D. Cal. July 12, 2016) (granting default judgment for violating § 310.3(a)(1)(viii)(C) where complaint alleged that defendants told consumers to stop making payments on debts yet failed to inform customers that defendants' debt relief services may increase the amount of money the customer owes due to fees and interests).

marketing materials to give the appearance of official government notices by using the image of a seal nearly identical to the Great Seal of the United States, a Washington, D.C. postal address, a citation to the United States Code, and a "WARNING" threatening fines or imprisonment.[86] FDAA's telemarketing scripts required personnel to state that its program ensured that consumers receive a portion of the fines and restitution ordered by the CFPB, its program was approved by the FTC, and it was "authorized to review, consult, and prepare consumer protection document on your behalf."[87] FDAA is not affiliated with, endorsed by, or sponsored by the Bureau and does not have the ability to provide consumers with restitution ordered by the Bureau.[88] Stating that its program was approved by the FTC represents that it is at least endorsed by the FTC, which is simply not true.[89]

The TSR expressly prohibits sellers or telemarketers from misrepresenting a seller's affiliation with, or endorsement or sponsorship by, any government entity.[90] The net impression created by FDAA's marketing materials was sufficient to mislead consumers about FDAA's affiliation with or endorsement by the government, in violation of the TSR.[91]

---

[86] Compl. ¶¶ 23-30.
[87] Compl. ¶¶ 34-36.
[88] Compl. ¶ 98.
[89] Compl. ¶ 98.
[90] 16 C.F.R. § 310.3(a)(2)(vii).
[91] *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1012 (N.D. Ind. 2000) (holding that based upon advertisements and telephone scripts, defendants misled consumers into believing their employment program was affiliated with or endorsed by the Postal Service).

The CFPA prohibits deceptive acts or practices.[92] As set forth above, an act or practice is deceptive if: (1) it is likely to mislead the consumer; (2) the consumer's interpretation of the act or practice is reasonable under the circumstances; and (3) the misleading act or practice is material. FDAA's misrepresentations were likely to mislead consumers to believe that FDAA was affiliated with, endorsed by, or sponsored by the Bureau or the FTC. Defendants used imagery and language in FDAA's solicitations that a consumer acting reasonably would associate with a Federal agency, and FDAA's employees reinforced those misrepresentations with false statements. The misrepresentations were material because they involved information important to consumers such as the nature of the program and FDAA's affiliation with federal consumer-protection agencies.[93]

---

[92] 12 U.S.C. §§ 5536(a)(1)(A), (B); 5531(a).

[93] *See FTC v. Loma Int'l Bus. Grp., Inc.*, No. MJG-11-1483, 2013 WL 2455986, at *4-6 (D. Md. June 5, 2013) (representations that defendants were "competent, qualified and legally authorized to provide the services at issue" were material because they involved "information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding [the services]" (internal quotation marks omitted)).

### 5.    The corporate entities acted as a common enterprise.

Federal Debt, Financial Document, and Clear Solutions are part of a common

enterprise owned and operated by Robert Pantoulis, Vincent Piccione, and David

Piccione. A common enterprise exists when the same individuals transact an integrated

business through interrelated companies as determined by analyzing five non-

dispositive factors: whether they (1) share common officers and employees, (2) operate

under common control, (3) share offices, (4) commingle funds, and (5) share advertising

and marketing materials.[94] Under the common-enterprise doctrine, companies are

jointly and severally liable for unlawful acts.[95]

Federal Debt, Financial Document, and Clear Solutions share officers, operate

under common control, and share office space. Federal Debt, Financial Document, and

Clear Solutions do not operate as distinct, arm's-length entities, but rather function as a

classic common enterprise, and they should be held jointly and several liable for the

violations alleged in the Complaint.

### 6.    The Principals are individually liable because they are covered persons who engaged in deceptive acts and also because they provided substantial assistance to FDAA's violations.

Defendants David Piccione, Vincent Piccione, and Robert Pantoulis are

individually liable under the CFPA as "covered persons" because they meet the

---

[94] *NDG Fin. Corp.*, 2016 WL 7188792, at *16-17 (holding the common-enterprise doctrine that applies in the FTC Act context also applies to violations of the CFPA) (following *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) and rejecting the reasoning in *Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016), where the court reasoned the common-enterprise doctrine does not apply under the CFPA because, unlike the FTC Act, which can only be enforced by the FTC, the CFPA can be enforced by multiple government agencies).
[95] *NDG Fin. Corp.*, 2016 WL 7188792, at *16 (citing *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014)).

definition of "related persons"[96] and "knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of [§ 5531]."[97]

Under the CFPA, liability for a deceptive act or practice is established when (1) the defendant is a "covered person"; (2) who has "engaged" in an unfair, deceptive, or abusive act or practice; (3) in connection with the offering or providing of a consumer-financial product or service.[98] Under the plain language of the statute, Defendants David Piccione, Vincent Piccione, and Robert Pantoulis meet the definition of "related persons"[99] because they were "director[s], officer[s], or employee[s] charged with managerial responsibility for . . . [a] covered person," FDAA.[100] As related persons they qualify as "covered persons" under the CFPA.

Defendants David Piccione, Vincent Piccione, and Robert Pantoulis were the directors, officers, or employees who managed FDAA's day-to-day operations. As the president, Vincent Piccione managed FDAA's operations, developed its marketing materials, oversaw its marketing activities, identified consumers to solicit, and exercised final decision-making authority over FDAA.[101] David Piccione was the telemarketing-sales floor manager, managed the telemarketers and call campaigns, ensured that FDAA's personnel followed telemarketing-sales scripts, and participated in the development of FDAA's marketing materials.[102] Robert Pantoulis was the director of client services, managed the administration of the companies' debt-relief program, and

---

[96] 12 U.S.C. § 5481(25)(C)(i) ("The term 'related person' . . . shall be deemed to mean a covered person for all purposes of any provision of Federal consumer financial law.").
[97] 12 U.S.C. § 5536(a)(3).
[98] 12 U.S.C. §§ 5536(a)(1)(A), (B); 5531(a).
[99] 12 U.S.C. § 5481(25)(C)(i).
[100] 12 U.S.C. § 5481(25)(C)(i).
[101] Compl. ¶ 9.
[102] Compl. ¶ 10.

oversaw employees administrating the program.[103] They are each liable under the CFPA because they each "engaged in" FDAA's deceptive acts.

Under the CFPA, it is also "unlawful for . . . any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of [§ 5531]."[104] Courts have articulated what constitutes "substantial assistance" in the securities context, which offers guidance here. Conduct is "substantial" if the defendants are associated with the venture, participated in the venture, and sought to make it succeed.[105] The Principals provided the requisite assistance as the architects and executors of FDAA's deceptive marketing materials and solicitation activities. They collaboratively created the marketing materials, wrote the telemarketing scripts, and engaged in solicitation activities that misrepresented the legal effects of the debt-relief and credit-repair services being offered. They developed and incorporated into the marketing materials and solicitation activities the unsubstantiated claims about the results the program could achieve for consumers. They also designed the marketing materials and wrote the solicitation scripts that falsely represented that FDAA was affiliated with, endorsed by, or sponsored by the Bureau and the FTC.

The Principals are also liable because they provided "substantial assistance" to FDAA's collection of advance fees and material misrepresentations about its program, which violated the TSR. The Principals knew about or consciously avoided knowing about FDAA's payment structures. The Principals also participated directly in FDAA's

---

[103] Compl. ¶ 11.
[104] 12 U.S.C. § 5536(a)(3).
[105] *CFPB v. D & D Mktg.*, No. CV 15-9692 PSG, 2016 WL 8849698, at *13 (C.D. Cal. Nov. 17, 2016) (citing *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012)).

operations and the design of FDAA's program, including its marketing materials—all activities that are sufficient for satisfying the TSR's "substantial assistance" elements.[106]

## C.     Plaintiff's Complaint supports the relief it requests.

In its Complaint, the Bureau seeks, in relevant part, (1) a permanent injunction to prevent future violations of the TSR and CFPA, (2) monetary relief to redress injury to consumers, and (3) civil money penalties against Defendants for their violations of the TSR and CFPA. This Court has the discretion to enter injunctive and monetary relief at this stage and it may do so without an evidentiary hearing "if there is an adequate evidentiary basis in the record from which to calculate an award." [107]

### 1.     Injunctive relief is required to prevent future violations.

The CFPA authorizes the Court to impose injunctive relief.[108] A permanent injunction is justified here because there is a "reasonable likelihood of future transgressions."[109] The Bureau's requested injunctive relief includes permanently

---

[106] *See* 16 C.F.R. § 310.3(b) ("It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketing is engaged in any act or practice that violates  . . . § 310.4 of this Rule."); 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995) (explaining that the knowledge or conscious avoidance requirement of the TSR is satisfied by "providing any script . . . or direct marketing piece used in telemarketing," or "providing an appraisal or valuation of a good or service . . . [that] has no reasonable basis in fact or cannot be substantiated"); *see also Affiliate Strategies, Inc.*, 2011 WL 4352411, at *11 (subcontractor "substantially assisted" in defendants activities and "knew" or "consciously avoided knowing" about defendants' deceptive marketing activities).

[107] *Teamsters Local 639 Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, No. TDC-15-3053, 2016 WL 7391516, at *2-3 (D. Md. Dec. 19, 2016) (court may make independent damages finding without an evidentiary hearing) (citing *Pope v.  United States*, 323 U.S. 1, 12 (1944)).

[108] 12 U.S.C. § 5565.

[109] *SEC v. Zale Corp.*, 650 F.2d 718, 720-21 (5th Cir. 1981); *see also SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) ("When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin

enjoining Defendants from (1) engaging in activities in the debt-relief and credit-repair industries, (2) collecting any fees from consumers currently enrolled in FDAA's program, (3) misrepresenting the results or costs of any services offered to consumers, (4) misrepresenting an affiliation with the government, (5) failing to make required disclosures under the TSR, and (6) engaging in deceptive debt-relief or credit-repair acts or practices.

An injunction is warranted against each of the Defendants. Defendants Federal Debt, Financial Document, and Clear Solutions existed solely to operate the illegal scheme that this suit seeks to halt, and an injunction would prevent them from operating again. An injunction is of equal import for the individuals given that the Principals operated FDAA for more than a year, had FDAA pose as a government-affiliated entity, and misrepresented their successes to collect millions of dollars in fees from unsuspecting consumers. Defendant Vincent Piccione has previously violated consumer protection laws. He was sued by the FTC in 2006 for violations of the do-not-call provisions of the TSR by a group of mortgage companies he owned and operated.[110] Since 2006, he has been "permanently restrained and enjoined from engaging in, causing other persons to engage in, or assisting other persons to engage in" violations of the TSR, the same law he has violated here.[111] The three individual Defendants together operated a scheme that was built on systemic violations of law. And, when sued by the Bureau for those violations, all three failed to answer. Their past actions and willingness

---

future misconduct." (quoting *United States v. Carson,* 52 F.3d 1173, 1184 (2d Cir. 1995))).

[110] *United States v. USA Home Loans, Inc.*, No. JFM 06 CV 2850 (D. Md. Oct. 31, 2006).

[111] *Id.* at *4-5.

to avoid accountability establish a strong inference of future wrongdoing and justify the permanent injunction.

### 2.    Monetary relief is required to compensate consumers.

The CFPA authorizes the Court to grant monetary relief, including restitution.[112] In this case, the appropriate measure of consumer redress is the total amount consumers paid to purchase goods or services, less refunds already given to consumers.[113] The Bureau's evidence establishes that consumers were deceived into paying FDAA $4,972,389.31 for its services.[114] In a case like this, where distressed consumers were deceived into paying large up-front fees and, in some cases, monthly installments thereafter for financial relief that never materialized, consumers are entitled to full redress. Moreover, the individual defendants are individually liable for the corporate defendants' acts and jointly and severally liable for the total amount of consumer redress.[115]

### 3.    Civil money penalties

The CFPA also requires the Court to impose civil money penalties on individuals who violate Federal consumer financial law.[116] The CFPA provides three tiers of statutory penalty amounts for each day during which a violation continues: (1) a first tier penalty of up to $5,639 for any violation of law; (2) a second tier penalty of up to

---

[112] 12 U.S.C. § 5565(a)(2)(C).
[113] *See, e.g., FTC v Stefanchik*, 559 F.3d 924, 931-932 (9th Cir. 2009); *FTC v Febre*, 128 F.3d 530, 535-537 (7th Cir. 1997).
[114] Exhibit A ¶ 16.
[115] *See FTC v. Ross*, 897 F. Supp. 2d 369, 388 (D. Md. 2012).
[116] 12 U.S.C. § 5565(c)(1) ("Any person that violates, through any act or omission, any provision of Federal consumer financial law *shall* forfeit and pay a civil penalty pursuant to this subsection." (emphasis added)).

$28,195 for a reckless violation of law; and (3) a third tier penalty of up to $1,127,799 for a knowing violation of law.[117]

Defendants' conduct was at minimum reckless, if not knowing, warranting at least a second tier penalty. Defendants crafted their marketing materials and scripts to deceive consumers into believing that their debt-relief activities were endorsed by, or even connected with, the government. The Defendants also took up-front fees in violation of the TSR, with one of the Principals under an injunction for earlier violations of the TSR. Levying a second tier penalty against Defendants using a calculation of one violation for each of the 575 harmed consumers would result in a penalty of more than $16 million.[118]

In determining the amount of a civil money penalty, the Court must take into account mitigating factors, including the financial resources and good faith of the Defendants, the gravity of the violations, the severity of the risks to or losses suffered by consumers, the history of previous violations, and "such other matters as justice may require."[119] None of these factors mitigate the penalty here. Although their operation was relatively small, Defendants took nearly $5 million from financially distressed consumers in little more than a year. Rather than acting in good faith by standing to account for their actions, Defendants elected to not appear in this Court. For these reasons, it would not be appropriate to reduce the penalty based upon mitigating factors and the Bureau requests that the Court impose a $16 million penalty jointly and severally against all Defendants.

---

[117] 12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1.
[118] Exhibit A ¶ 12.
[119] 12 U.S.C. § 5565(c)(3).

## CONCLUSION

None of the Defendants has answered or otherwise provided a defense in this action, despite having had ample notice and opportunity to do so, and the Clerk of the Court has properly entered a default against each Defendant. Because the Complaint both establishes Defendants' violations of the CFPA and TSR and supports the relief requested, the Court should enter the attached proposed Default Judgment against Federal Debt Assistance Association, LLC, Financial Document Assistance Administration, Inc., Clear Solutions, Inc., Robert Pantoulis, David Piccione, and Vincent Piccione, providing for injunctive and monetary relief and a civil penalty.

Respectfully submitted,

KRISTEN A. DONOGHUE
*Enforcement Director*
JEFFREY PAUL EHRLICH
*Deputy Enforcement Director*
KARA K. MILLER
*Assistant Litigation Deputy*

/s/_____
Mary Olson (District of Maryland Bar No. 807644; Illinois Bar No. 6297334)
Carmen L. Christopher (District of Maryland Bar No. 92566; California Bar No. 231508)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
230 S. Dearborn St., Suite 1590
Chicago, IL 60604
Telephone (Olson): 312-610-8977
Telephone (Christopher): 312-610-8961
Fax: 312-610-8971
Mary.Olson@cfpb.gov
Carmen.Christopher@cfpb.gov

and

Stephanie Duff-O'Bryan (District of Maryland
Bar No. 807908; Texas Bar No. 24087448;
New York Bar No. 5026224)
*Enforcement Attorney*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Duff-O'Bryan): 202-435-9358
Fax: 202-435-7722
Stephanie.Duff-OBryan@cfpb.gov

*Attorneys for the Consumer Financial
Protection Bureau*